JAMES J. CALIGIURI and ROSE M. CALIGIURI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Caligiuri v. Commissioner
Docket No. 1120-73.
United States Tax Court
T.C. Memo 1975-319; 1975 Tax Ct. Memo LEXIS 52; 34 T.C.M. (CCH) 1386; T.C.M. (RIA) 750319; October 29, 1975, Filed Drew R. Tillotson and Marvin F. Peterson, for the petitioners. Robert J. Murray, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax as follows: Year
Amount
1958
$ 8,366.13
1959
3,258.70
1960
1,422.53
1961
9,126.78
1962
11,217.33
1963
17,092.11
1964
5,225.29 In addition, the Commissioner determined that Petitioner James J. Caligiuri was liable for the fraud penalty (section 6653(b)) [1] as follows: Year
Amount
1958
$ 4,183.07
1959
1,629.35
1960
711.27
1961
4,563.39
1962
5,608.67
1963
8,546.06
1964
4,605.81
The issues for decision are: 1. Whether unidentified deposits to petitioners' bank account in 1958, 1959 *54 and 1960 constitute income and, if such items were income, whether Petitioner James J. Caligiuri's failure to report such income was due to fraud. 2. If assessment of a deficiency for 1958 is not barred by the statute of limitations, whether petitioners advanced $7,500 to Crocker Poultry and Egg Co. in 1954 and, if a valid debt was created, whether it was a nonbusiness bad debt worthless in 1958. 3. Whether petitioner failed to report rental income of $1,011.52, $751.90, $765.35, $671.44 and $669.99 for the taxable years 1959 through 1963, respectively. 4. Whether petitioners are entitled to deduct a portion of the cost of owning and maintaining their home as an office during the taxable years 1961 through 1964. 5. Whether petitioners purchased grain for Baxter Milling Service in 1961 in the amount of $3,500 in excess of that allowed by the Commissioner. 6. The extent of the loss sustained by petitioners upon the sale of Baxter Milling Service in 1967 and, as a consequence, the extent of petitioners' net operating loss carryback from 1967 to 1964. 7. Whether petitioners sustained a nonbusiness bad debt loss in 1958 resulting from the partial worthlessness of an advance *55 of $7,500 made by them to Crocker Poultry and Egg Co. in 1954. FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of facts and exhibits are incorporated by this reference. Petitioners James J. and Rose M. Caligiuri, husband and wife, resided in Des Moines, Iowa, when their petition was filed. They filed joint Federal income tax returns for the taxable years 1958 through 1964 with the District Director of Internal Revenue, Des Moines, Iowa. Rose M. Caligiuri is a petitioner by reason of having filed a joint Federal income tax return with James J. Caligiuri (hereinafter petitioner). Petitioner was born in Des Moines, Iowa and attended public school through the 9th grade. After being employed in various jobs, petitioner entered the poultry business and worked for Hy-Line Poultry Farms, Inc. (Hy-Line) as a night cleaning man and within a short time became an assistant to the hatchery manager and eventually became hatchery manager for approximately 7 years. In July of 1956, petitioner went into the business of hauling eggs for Hy-Line by truck. During the taxable years 1958 through 1964, petitioner owned and operated as sole proprietor a trucking business *56 known as Caligiuri Trucking, also known as J & S Trucking. He operated the trucking business from his residence on East Jackson Street, Des Moines, Iowa. The trucking business included a contract with Hy-Line to transport poultry, eggs and other poultry products. During the taxable years 1958 through 1964, petitioner also owned and operated as sole proprietor a retail business known as Baxter Milling Service in Baxter, Iowa. Baxter Milling Service operated a feed and supply company for farms and was a retail outlet for Ralston Purina Co. of Iowa Falls, Iowa. prepared using the cash method of accounting except for the inventories of Baxter Milling Service. The returns for 1958, 1959 and 1960 were prepared by Mr. Gordon Stewart. In addition to preparing returns for 1958, 1959 and 1960, Mr. Stewart maintained books of account for Baxter Milling Service. From 1961 through 1964, petitioners' Federal income tax returns were prepared by Mr. Harry L. Horsman. Mr. Horsman maintained the accounting records for Baxter Milling Service for 1961 through 1964. No accounting books or records were maintained from 1958 to 1964 for the trucking business. During the taxable years 1961 through 1964, *57 petitioner prepared a summary sheet to assist his return preparer, Mr. Horsman, in the preparation of the respective Federal income tax returns. The summary sheets were prepared from his bank records and contained computations of trucking income and expenses. Petitioner prepared the summary sheets for the taxable years 1961 through 1964 primarily from an analysis of canceled checks and bank statements. Gross receipts from the trucking business reflected on the respective summary sheets were computed by examining and totaling the deposits reflected on the bank statements identified as relating to the trucking business. Expenses relating to the trucking business and itemized personal deductions were computed by reviewing canceled checks. Petitioner's return preparer for 1961 through 1964 did not analyze bank records or take any other action to verify the accuracy of the summary sheets. The summary sheets which petitioner submitted to his return preparer for 1958, 1959 and 1960 were not available at the time of trial. During the taxable years 1958, 1959 and 1960, petitioners maintained a checking account at the Iowa State Bank, Des Moines, Iowa, which he utilized for the trucking business. *58 Petitioner withheld funds from bank deposits to his trucking account for use as traveling expenses in the amounts of $2,147.41, $558.83 and $1,497.05 for the taxable years 1958, 1959 and 1960, respectively. During the taxable years in issue, petitioner withheld the following from deposits to his checking account for his trucking business: No. of
Withholding Year
Deposits
From Deposits
Percentage
1958
30
18
60%
1959
22
11
50%
1960
25
16
64%
1961
26
21
80.8%
1962
23
13
56.5%
1963
17
6
35.3%
1964
29
7
24.1% During the taxable years in issue, petitioner received the following amounts from Hy-Line for hauling and reported the following trucking receipts on the respective Federal income tax returns: Trucking
Hy-Line
Receipts Year
Receipts
Reported
1958
$36,735.18
$38,838.60
1959
35,323.23
32,601.55
1960
48,886.12
46,354.44
1961
64,600.55
53,493.79
1962
78,138.98
60,676.65
1963
89,245.92
62,303.63
1964
90,915.09
73,005.90 The Commissioner's analysis of petitioner's bank records for the taxable year 1958 and the records of third parties resulted in an adjustment in his statutory *59 notice of deficiency to petitioner's gross receipts from trucking for 1958 in the amount of $16,453 computed as follows: Net Deposits per
Bank Statements
$72,172.01
Withdrawals from Deposits
2,147.41
Items Not Deposited: Hy-Line Check of
1/27/58
$ 283.66
Hy-Line Check of
2/12/58
1,413.16
Hy-Line Check of
8/12/58
139.32
1,836.14
Total Receipts
$76,155.56
Less: Loan Proceeds--
5/2/58 $10,000
8/18/58 8,000
18,000.00
Transfer of Funds
3/5/58
2,863.96
20,863.96
Total Trucking Receipts
$55,291.60
Trucking Receipts per
Return
38,838.60
Adjustment per Statutory
Notice
$16,453.00
In view of evidence which petitioner produced subsequent to the issuance of the statutory notice of deficiency, respondent recomputed the adjustment to petitioner's trucking receipts for 1958 to be $6,307.75 as follows: Adjustment per
Statutory Notice
$16,453.00
Hy-Line Check of
1957 deposited
in 1958
$1,427.58
Transfer of Funds: 2/24/58
1,639.05
3/18/58
1,049.72
4/28/58
6,628.90
10,745.25
Subtotal
$ 5,707.75
Plus Unidentified
Deposits to Savings
Account
1/9/58 $100
1/21/58 100
4/1/58 100
5/8/58 100
7/18/58 200
600.00
Adjustment to
Petitioner's
Trucking Receipts
$ 6,307.75
*60 Respondent's analysis of petitioner's bank records for the taxable year 1959 and the records of third parties resulted in the adjustment to his gross receipts from trucking for 1959 in the amount of $9,734.98 computed as follows: Net Deposits per
Bank Statements
$37,993.70
Withdrawals from
Deposits
558.83
Items Not Deposited: Hy-Line Check of
12/21/59 Deposited
in 1960
$ 836.55
Hy-Line Check of
12/30/59 Deposited
in 1960
747.45
1,584.00
Plus Unidentified
Deposits to Savings
7/14/59
$ 300.00
8/14/59
600.00
9/10/59
1,300.00
2,200.00
Total Receipts
$42,336.53
Trucking Receipts
per Return
32,601.55
Adjustment per
Statutory Notice
$ 9,734.98 The Commissioner's analysis of petitioner's bank records for the taxable year 1960 resulted in an adjustment in his statutory notice of deficiency to petitioner's gross receipts from trucking for 1960 in the amount of $2,531.68. The $2,531.68 included an item of income in the amount of $1,618.03 which petitioners reported as income in 1961. The Commissioner's agent did not examine the Baxter Milling Service checking account to determine if there were transfers from it to the checking *61 account for the trucking business. Petitioner submitted financial statements periodically to Iowa State Bank in connection with money he borrowed. The statements were prepared by Carl M. Williams, vice president of the bank, solely on the basis of information submitted to him by petitioner. Each financial statement was executed by petitioner with a statement verifying the accuracy of the facts set forth and an informative statement regarding state statutory penalties for falsification. The date of the financial statements and certain items contained therein are as follows: Date of
Annual Gross
Annual Net
Monthly Statement
Trucking Income
Trucking Income
Rental Income
December 18, 1959
$40-45,000
$16-18,000
0
July 7, 1960
0
14,000
$145-165
April 28, 1961
0
0
0
February 27, 1962
$65,000 *
26,000
0
May 3, 1962
0
17,000 $150
During the taxable years 1959 through 1964 petitioner owned a residential apartment building in Baxter, Iowa. The apartment units were leased to various tenants and petitioner received rental *62 income during 1959 through 1964 which he failed to report on the respective joint Federal income tax returns. During the taxable years 1961 through 1964, a Mr. Weber leased a residential unit from petitioner for $65 per month. During the period June 1, 1961 through March 31, 1963, Mr. and Mrs. David Brant leased an apartment unit from petitioner for $65 per month. During the period June 1, 1963 through May 31, 1964, Mr. and Mrs. Herman Krueger leased an apartment unit from petitioner for $65 per month. Two apartment units were rented during 1959 and 1960. Petitioner claimed as an itemized deduction of $180 for 1959, interest paid in connection with loans for his rental property. In his statutory notice of deficiency, the Commissioner determined that petitioner failed to report net rental income of $1,011.52, $751.90, $765.35, $671.44 and $669.99 for the taxable years 1959 through 1963, inclusive. Petitioner claimed $50 per month or $600 per year for the taxable years 1961 through 1964 as the cost of an office in his residence. The residential telephone was used for both personal and business calls from various truck drivers for petitioner's trucking business at all hours of the *63 day. A desk and file cabinet were kept on an entrance porch to the residence and the kitchen table was used as a desk when petitioner prepared his income tax returns. Petitioner did not maintain a business office for his trucking business other than at his residence. On or about November 30, 1961, petitioner obtained a loan from Ralston Purina Co., and he caused his bookkeeper, Mr. Horsman, to make the following journal entries in the books and records of Baxter Milling Service: Debit
Credit
11-30-61 Loan from Purina Kept Personally
$10,800.00
Purchased Grain Personally
for Mill
$3,500.00
Purchased Building Personally
for Mill
6,650.45
(Balance Unaccounted For)
649.55 The loan proceeds were deposited into petitioner's checking account maintained for the trucking business. The Commissioner, in his statutory notice of deficiency dated November 20, 1972, determined the petitioner's cost of goods sold for Baxter Milling Service for 1961 should be reduced $3,500 or from $148,223.24 to $144,723.24. On or about September 15, 1967, petitioner sold the tangible assets of Baxter Milling Service. Although the purchaser was a Mrs. Charlotte McCormick, *64 petitioner's negotiations were with Mr. Russel H. Phelps, Jr., extending over a period of approximately 2 or 3 months. Mr. Phelps had been employed by Ralston Purina Co. for approximately 5 years as district sales manager and was, as a consequence, familiar with Baxter Milling Service and anxious to see it continue as one of his customers. Petitioner's initial asking price for Baxter Milling Service was $125,000. After examining the physical assets and attempting to project the future profitability of the business, Mr. Phelps advised Mrs. McCormick and she executed a contract of sale which provided in part: [It] is hereby mutually agreed by and between the parties hereto that Sellers agree to sell and Buyer agrees to purchase the business presently operated by Sellers in the name of Baxter Milling Service, including the real estate, operating and office equipment and inventory for a total consideration of Eighty-seven Thousand Five Hundred and no/100 Dollars ($87,500.00), plus the inventory computed at cost, except for obsolete items mutually agreed upon by the parties. Five Hundred and no/100 Dollars ($500.00) has been paid, the receipt of which is hereby acknowledged with the *65 balance of said purchase price to be paid as follows: Nineteen Thousand Five Hundred and no/100 Dollars ($19,500.00), plus the value of the inventory at cost, except for obsolete items mutually agreed upon by the parties on or before September 15, 1967, when possession is to be given. The balance of Sixty-seven Thousand Five Hunred [sic] and no/100 Dollars ($67,500.00) to be represented by an equal amount of six per cent (6%) cumulative preferred stock of a corporation to be formed by Buyer with such stock to have a par value of Five Hundred and no/100 Dollars ($500.00), per share. The parties mutually agree that purchaser shall buy from Sellers Five Thousand and no/100 Dollars ($5,000.00) of such preferred stock on January 1, of 1968 and pay therefor, par value, plus any accrued dividends. All such preferred stock shall be callable at the option of the corporation. Dividends on such stock shall be paid quarterly beginning January 1, 1968, at the rate of six per cent (6%), per annum, with such dividends to be paid only out of earnings and if such earnings are not equal to the quarterly payment, such payment shall be cumulative with all preference stock dividend payments made before *66 any dividends are paid to common stockholders. The six per cent (6%) cumulative preferred stock shall be nonvoting stock of the corporation. At the time the contract of sale was executed, all parties were of the opinion that the contract was fair and reasonable. Pursuant to the contract, a corporation known as P & M Farm Supply, Inc. was incorporated on September 15, 1967, for the purpose of acquiring the assets of Baxter Milling Service. On the date of incorporation, the assets purchased were transferred to P & M and recorded on its corporate books as follows: ASSETS: Inventory
$ 14,560.00
Buildings
26,380.00
Equipment
58,370.00
Land
2,750.00
Total Assets
$102,060.00
LIABILITIES: Account Payable - J. Caligiuri
$ 14,560.00
CAPITAL: Capital Stock - Common
$ 20,000.00
Capital Stock - Preferred
67,500.00
Total Liabilities & Capital
$102,060.00 Petitioner thereupon received the $19,500 balance of the agreed upon $20,000 and 135 shares of 6 percent cumulative nonvoting preferred stock having a par value of $500 per share. Petitioner owned all of the nonvoting preferred stock. All of the common stock, 40 shares, having a par value of $500 per share, *67 was issued to Charlotte McCormick in exchange for her investment of $20,000 in cash. During January of 1968, Mrs. McCormick contributed an additional $5,000 to the capital account of P & M and received 10 additional shares of common stock. Mr. Phelps and Mrs. McCormick had negotiated with the petitioner for the issuance of nonvoting preferred stock rather than common stock because they sought to prevent petitioner's control of the business after the sale. At or near the time that the agreement of sale was executed, Mr. Phelps had an equitable interest in P & M by reason of a promissory note which he had given to Mrs. McCormick. The promissory note was intended to help Mrs. McCormick defray any losses which might result from the operation of P & M. An agreement between Mr. Phelps and Mrs. McCormick further provided that they would share ownership of the business equally after the initial debts of P & M had been paid and petitioner's stock had been redeemed. If Baxter Milling Service were profitable, the purchasers intended to redeem from profits petitioner's preferred P & M stock. During January of 1968 P & M redeemed 10 shares of petitioner's preferred stock for $5,000. During 1969 *68 P & M redeemed an additional 7.5 shares of petitioner's preferred stock for $3,750. On September 15, 1967, the date of sale, petitioner's adjusted basis in the tangible assets of Baxter Milling Service (excepting the inventory purchased separately) was $98,607.44. The sales price of the Baxter Milling Service assets was $87,500. During March of 1954, petitioners advanced $7,500 to Crocker Poultry and Egg Co. Crocker Poultry was owned by Paul, James and Anthony Leto, brothers of Mrs. Caligiuri. The funds were advanced because Crocker Poultry was in financial trouble. A promissory note may have been executed at the time of the advance, but was unavailable at trial. There was no specific due date on which the advance was to be repaid and there was no provision made for the payment of interest. Petitioner and Mrs. Caligiuri received a mortgage from Crocker Poultry dated March 2, 1954. The mortgage was acknowledged on August 1, 1958 and filed with the county recorder on August 6, 1958. On August 13, 1958, Crocker Poultry petitioned the District Court for the Southern District of Iowa to be adjudged a bankrupt. Petitioner filed a claim in the bankruptcy proceeding for the $7,500 advance. *69 Crocker Poultry was adjudged a bankrupt on August 14, 1958. On April 24, 1959 petitioners executed a release of the mortgage which was filed with the county recorder on June 4, 1959. On May 3, 1960 the trustee in bankruptcy was ordered and on the same date he paid petitioners $749.90 on account of the $7,500 advance. Petitioners claimed the entire $7,500 as a bad debt deduction on their joint Federal income return for 1958. The Commissioner, in his statutory notice of deficiency, disallowed the $7,500 bad debt deduction. By an amendment to their petition, petitioners claim that the debt was nonbusiness in nature and that they are entitled to a $1,000 short-term capital loss for 1958 and $1,000 shortterm capital loss carryover for each of the taxable years 1959 through 1964, respectively. On June 14, 1959 a savings account was opened at United Federal Savings and Loan Association in the name of petitioners for the benefit of Mrs. Caligiuri's brother, Anthony Leto, who was in California. He returned to the area and the savings account was changed to the name of Anthony Leto and his wife. Deposits to the account, while standing in the name of petitioners, were from the rental of Mr. *70 Leto's residence or from insurance proceeds from a fire which had damaged the house. Withdrawals from the account during this period were to replace damaged items in the house or were payments to Mr. Leto. In 1968, petitioner was found guilty by a jury of filing false and fraudulent income tax returns under section 7201 of the Code for taxable years 1961 to 1964, inclusive. ULTIMATE FINDINGS OF FACT 1. Petitioner's failure to report certain items as income for the taxable years 1958, 1959 and 1960 was not due to fraud and, consequently, assessment of additional tax for those years is barred by the limitations of section 6501(a). 2. Petitioner failed to report apartment rental income during the taxable years 1961 through 1963. 3. Petitioners are entitled to deduct $50 per month for the taxable years 1961 through 1964 as the cost of maintaining a business office in their home. 4. Petitioners are not entitled to deduct additional grain purchases of $3,500 for Baxter Milling Service in 1961. 5. Petitioners are entitled to deduct on their return for 1964 only $5,100.85 as a net operating loss carryback from 1964 resulting from the sale of the Baxter Milling Service assets. *71 6. Petitioners did not, in 1958, sustain a nonbusiness bad debt loss from the partial worthlessness of an advance of $7,500 to Crocker Poultry and Egg Co. in 1954. OPINION The Commissioner, in his statutory notice of deficiency, determined that Petitioner James J. Caligiuri was liable for the fraud penalty for the taxable years 1958 through 1964, inclusive. Mr. Caligiuri was convicted of filing fraudulent returns for the taxable years 1961 through 1964 and does not contest imposition of the fraud penalty for such years. Assessment of additional tax for the years 1958 through 1960 is barred by section 6501(a) of the Code except for fraud. The adjustments contested by petitioners for the years 1961 through 1964 are as follows: Claimed or
Allowed or Taxable
Reported by
Determined Year
Item
Petitioners
by Commissioner
1961
Home Office Expense
$ 600.00 $0
Apartment Rental Income
0
765.35
Baxter Milling Services - Purchases
148,223.24
144,723.24
1962
Home Office Expense
600.00
0
Apartment Rental Income
0
671.44
1963
Home Office Expense
600.00
0
Apartment Rental Income
0
669.99
1964
Home Office Expense
600.00
0
Net Operating Loss Carryback from
1967 Sale of Baxter Milling Service
71,490.32
5,100.85
*72 The issue of fraud is one of fact to be determined upon a consideration of the entire record. William G. Stratton,54 T.C. 255 (1970). The burden of proving fraud under section 6653(b) is upon respondent. Sec. 7454. Fraud is never presumed. It must be affirmatively established by clear and convincing evidence. Anson Beaver,55 T.C. 85 (1970); Rule 142, Tax Court Rules of Practice and Procedure.Direct evidence of fraudulent intent is seldom available and whether it exists must be determined from the conduct of the taxpayer and the surrounding circumstances. Respondent relies on the following items as proof of fraud: 1. Consistent reporting on the returns of net deposits to the trucking account and the alleged failure to report "haulback" truck income. 2. Consistent omission of rental income. 3. Inconsistencies between financial statements and income tax returns. The record as a whole does not adequately support respondent's determination of fraud for the taxable years 1958 through 1960. Petitioner reported his taxable income from his trucking *73 enterprise by adding deposits and eliminating non-income items. Respondent has accepted this as a satisfactory method of arriving at a clear reflection of petitioner's trucking income, section 446(a)(c)(1), but seeks to attribute a fraudulent intent to petitioner's pattern of making net deposits and his failure to account for and report deposits of $6,307.75, $9,734.98, and $2,531.68 for the taxable years 1958 through 1960, respectively. Petitioner, on the other hand, has reduced the deposits not reported as income by explaining that they were either interbank transfers, deposits of cash by Mrs. Caligiuri which she accumulated at home, repayments of small loans, or amounts erroneously reported in the wrong taxable year. Accepting petitioner's explanations, which are supported in the record, the deposits not accounted for are $2,931.22, $3,350.98 and $913.65 for the respective years in question. Three savings accounts found subsequent to the mailing of the statutory notice of deficiency and the interbank transfers which were subsequently discovered clearly supports petitioner's contention that substantial deposits were from nontaxable sources. We do not believe that revealing the existence *74 of such transfers at such a late date was an intended deception. Although some of the unidentified deposits may be taxable income, respondent has not convinced us by clear proof that the omissions from income were fraudulent. In order to establish fraud by the bank deposits method, respondent must prove that petitioner had a "likely source" for the omitted income. Holland v. United States,348 U.S. 121 (1954). A mere showing that the petitioner made bank deposits in excess of his reported income without showing some source from which the taxpayer could have earned taxable income is insufficient evidence of fraud. C.B.C. Super Markets, Inc.,54 T.C. 882, 897 (1970), Denny York,24 T.C. 742 (1955). We do not believe that petitioner earned income not reported on his returns from trips back to Des Moines from transporting eggs. We believe the testimony of one of petitioner's drivers that the trucks always returned empty. Although we have rejected respondent's theory of the source of unreported income, fraud may also be proven if all possible *75 sources of nontaxable income are negated. United States v. Massei,355 U.S. 595 (1958). The revenue agent admitted that an adequate and full examination of the Baxter Milling Service checking account was not conducted for the taxable years 1958 through 1960 in order to discover transfers to the account for the trucking business. Such a failure is detrimental to respondent's prima facie case. United States v. Morse,491 F.2d 149, 152 (1st Cir. 1974); United States v. Frank,151 F.Supp. 866, 868 (W.D. Pa. 1956), affd. 245 F.2d 284 (3d Cir. 1957), cert. denied 355 U.S. 819 (1957). Accordingly, we find respondent has failed to establish fraud by clear and convincing evidence that petitioner omitted from income taxable receipts from the trucking business. We accept respondent's determination that petitioner failed to report net apartment rental income of $765.35, $671.44 and $669.99 for the taxable years 1961 through 1963. However, for the taxable years 1959 and 1960, we do not find the omissions to be fraudulent. We agree with respondent that in view of the occupancy experience for 1961, 1962 and 1963, *76 it is not unreasonable for him to base his determination for 1959 and 1960 upon full occupancy. However, such an inference does not support, in a clear and convincing manner, fraudulent omissions. Petitioner testified that the two apartment units were vacant much of the time in 1959 and 1960. Respondent produced a Mr. Weber as a witness who testified that he rented one of the apartment units from petitioner from September 1, 1960 through December 31, 1963. Respondent argues on brief, without citing any authority, that Mr. Weber would know whether the other apartment was rented; therefore "Petitioner's failure to cross-examine Mr. Weber on the issue after respondent had illicited [sic] testimony regarding the rental income question on direct examination is anomalous to the argument which he has advanced." Such an argument by respondent ignores one of the most frequently violated cardinal rules of trial technique; i.e., do not ask a question on cross-examination unless you know what the answer will be. [2] Mr. Weber was respondent's witness. Surely the witness was interviewed before he testified. Respondent hoped to establish by Mr. Weber's testimony that petitioner earned rental *77 income which was not reported. If either party was obligated to elicit facts from the witness, it was respondent. We can only assume that the facts would be unfavorable. Wichita Terminal Elevator Co.,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Mr. Weber rented the apartment on September 1, 1960, so it is doubtful that he had knowledge of the vacant apartment in 1959 and the first 8 months of 1960. Petitioner contends that his gross rental income for the taxable years 1959 and 1960 was largely, if not completely, offset by deductible expenses. Although petitioner has not clearly shown that deductible rental expenses exceeded rental income, there is sufficient doubt as to whether the apartment units were fully occupied in 1959 and 1960 and a finding of fraud cannot be sustained on respondent's determination representing a nominal difference in the depreciation rates. The evidence concerning the discrepancies between petitioner's income tax returns and his financial statements, which were sometimes prepared very close in point of time, does not establish a fraudulent *78 pattern with respect to petitioner's preparation of his returns. What the evidence does establish is a pattern of gross negligence in the preparation of the returns and meticulous care in the preparation of the financial statements. Petitioner devoted days to the preparation of the financial statements and treated his tax reporting duties haphazardly. Negligence to the extreme does not support a finding of fraud. Petitioners claim a nonbusiness bad debt worthless in 1958 as the result of advances made to Crocker Poultry. No tax relating to 1958 was paid or credited subsequent to the mailing of the statutory notice of deficiency on November 20, 1972, and we have no evidence that petitioners filed a claim for refund relating to such item. Consequently, our ancillary refund jurisdiction pursuant to section 6512(b)(1) is precluded by the limitations of section 6512(b)(2). The record supports a finding that petitioner is entitled to a deduction for a home office expense for the taxable years 1961 through 1964. Although there is no evidence in the record as to specific amounts of overhead costs, such as insurance, utilities, telephone and taxes, we are convinced that petitioner's substantial *79 trucking enterprise required an office. He had no office other than his home. Under the rule in Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930), we accept as reasonable petitioner's estimated costs of $50 per month as the business portion of his home. Petitioner claims feed purchases of $148,223.24 for Baxter Milling Service during 1961 and the Commissioner, unable to verify $3,500 of such amount on audit, allowed purchases of only $144,723.24. Although the books and records of Baxter Milling Service disclose a journal entry to verify the transaction, petitioner has offered no other evidence to support the alleged purchase. Petitioner contended that he paid the $3,500 for feed from a $10,800 loan from Ralston Purina which was deposited into the checking account maintained by petitioner for the trucking business. The journal entry was made by the bookkeeper, Mr. Horsman, at petitioner's direction without further support or explanation. We find petitioner has failed to sustain his burden and the deduction is disallowed. Wichita Terminal Elevator Co.,supra.
Petitioners claim a net operating loss deduction of $71,490.32 carried back to 1964 from the 1967 *80 sale of Baxter Milling Service assets and respondent allowed only $5,100.85. Mrs. McCormick and Mr. Phelps purchased the assets in the name of Mrs. McCormick and simultaneously transferred them to the newly organized corporation, P & M Corp. The assets were sold pursuant to written contract for a negotiated consideration of $87,500, composed of $20,000 in cash and, according to the contract, "[the] balance of Sixty-seven Thousand Five Hunred [sic] and no/100 Dollars ($67,500.00) to be represented by an equal amount of six per cent (65) cumulative preferred stock" of the P & M Corp. Petitioner received 135 shares of the nonvoting preferred stock having a par value of $500 per share. Pursuant to the terms of the agreement of sale, P & M redeemed 10 shares of petitioner's P & M preferred stock in January of 1968 for $5,000 and 7.5 shares in 1969 for $3,750. Petitioner contends that the P & M preferred stock had no value, except for $5,000 received upon redemption in 1968, and that his loss on the sale of the assets and consequently his net operating loss carryback deduction for 1967 should be accordingly increased. Based upon Commissioner v. Danielson,378 F.2d 771 (3d Cir. 1967); *81 Ullman v. Commissioner,264 F.2d 305 (2d Cir. 1959); respondent contends that petitioner should be bound by the tax consequences of his written agreement of sale and he should not be permitted to urge that the substance of the sale was other than its form. We agree with respondent. Petitioner has not offered sufficient proof to challenge the consequences under either the stringent standard of proof enunciated in Commissioner v. Danielson, supra at 775 (proof sufficient to alter construction or to show unenforceability) or the less rigorous strong proof rule enunciated in Ullman v. Commissioner,supra. To the contrary, as demonstrated by the 1968 redemption, petitioner received the benefit of his bargain and no doubt, had operations continued to be profitable, there would have been future redemptions. At best, petitioner considered the preferred stock to be similar to installment notes and he must bear the consequences of his uninformed or misinformed beliefs. We find it more likely that sometime subsequent to the year of purchase, *82 1967, it became evident that P & M was a losing proposition and petitioner now claims such hindsight was available to him in 1967. The evidence supporting the fair market value of the Baxter Milling Service assets on the date of sale clearly supports the $87,500 negotiated sales price. Because both the buyer and seller were willing and not under any compulsion to buy or sell, it is clear that the remaining $67,500 of the sales price was satisfied with the preferred stock and we find that its value was $67,500. Petitioners rely upon Luther Bonham,33 B.T.A. 1100 (1936), affd. 89 F.2d 725 (8th Cir. 1937), to encourage our rejection of the terms of the instant contract and its accompanying economic reality. The terms of the agreement in Bonham,supra at 1105, which we characterized as "the basis of exchange and not as an indication of fair market value" presented the sellers with the option or choice of accepting $360 or common stock. Such a circumstance is fraught with numerous conflicting inferences as to value and is not presented in the instant case. The Commissioner's determination as to the net operating loss carryback from 1967 to 1964 *83 is, therefore, approved. Petitioners, on their return for 1958, claimed as a business bad debt, an advance in 1954 of $7,500 to Crocker Poultry and Egg Co. The Commissioner disallowed the deduction in his statutory notice of deficiency. By an amendment to their petition, petitioners claimed the debt to be nonbusiness and asked us to find that the worthlessness in 1958 resulted in a short-term capital loss limited to $1,000 in 1958 and carryovers of $1,000 to each of the taxable years 1959, 1960, 1961, 1962, 1963 and 1964. The worthlessness of the debt cannot be disputed because Crocker Poultry was adjudged a bankrupt in 1958 and petitioners received only $749.90 on their claim for $7,500. Respondent questions whether the money was advanced and, if so, whether a legally enforceable debt was created. In addition, he contends that there were repayments by use of a savings account at United Federal Savings and Loan Association. Crocker Poultry and Egg Co. was a corporation owned, operated and controlled by three of Mrs. Caligiuri's brothers. The record supports a finding contained in our findings of fact that $7,500 was advanced by petitioners to Crocker Poultry and Egg Co. in 1954. *84 Crocker Poultry and Egg Co. filed a petition in bankruptcy on August 13, 1958 and petitioners filed a claim for $7,500 as a secured creditor accompanied by a mortgage in that amount. The mortgage was dated March 2, 1954, acknowledged August 1, 1958 and recorded August 6, 1958. No promissory note was filed with the claim, nor was a note offered in evidence before us, nor was any explanation offered as to the absence of a promissory note. Although the Referee in Bankruptcy allowed petitioners' claim, it was allowed as an unsecured claim, indicating some doubt as to the validity of the mortgage. We doubt whether a note was executed. If petitioners possessed the note when they filed the claim they would have attached the note. Moreover, they could have testified as to the execution of the note and its disposition. Wichita Terminal Elevator Co.,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). A purported loan between family members is always subject to rigid scrutiny and petitioners must prove the existence of a valid, enforceable debt. Petitioners could have elicited the testimony of Mrs. Caligiuri's brothers who owned Crocker Poultry *85 but they did not do so nor was any explanation offered as to why they were not called as witnesses. Under such circumstances we must conclude that their testimony would not be favorable. Wichita Terminal Elevator Co.,supra.Moreover, the testimony of Mrs. Caligiuri convinces us that the repayment of the advance was conditional, not legally enforceable. She testified as follows: Q Mrs. Caligiuri, if I may interrupt you, if you can try to restrict your answers, in the interest of time. A Well, I'm telling you what happened. All right. They weren't making any money. The business -- they bought this new equipment. The money went for this new equipment. All right. They did for a little bit make a little money, but then in that poultry business you either have to go way big or get out. So, they just weren't doing any good. Q All right. Now, let's back up a little bit. What happened to Crocker Poultry and Egg Company? A Well, I'll tell you, they were losing money. They were going to pay me when they started making money. Well, when I first gave them the money, naturally it took -- my husband kept saying you better start having them pay you. Well, they didn't have it to pay *86 me. So, how could I get money off of them? I just couldn't. Our -- so the business kept getting worse, and I'll tell you, it caused a lot of arguments with my husband, almost caused a divorce, if you want to know the truth. The promise to repay the advance must not be subject to a contingency which never occurs. Evans Clark,18 T.C. 780, 783 (1952), affd. per curiam, 205 F.2d 353 (2d Cir. 1953). Accordingly, we hold that the advance did not create a valid debt in 1954 and its worthlessness in 1958 did not give rise to a bad debt loss in 1958 or to carryovers resulting therefrom. In so holding, however, we do not agree with respondent that Crocker Poultry repaid the loan from the savings account maintained by Mrs. Caligiuri for her brother. We have found as a fact that the account was used for the purpose to which Mrs. Caligiuri testified. Decision will be entered under Rule 155.
Footnotes
1. All Code references are to the Internal Revenue Code of 1954, as amended.↩
*. Originally listed by Carl M. Williams at $40,000 to $45,000 per year. Changed at petitioner's request to $65,000.↩
2. Goldstein, Trial Technique, sec. 19.39, p. 64 (2d ed.)↩